IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT A. MCCAFFERTY,
individually and doing business as
NORTH COUNTRY BREWING COMPANY,

                Plaintiff,

      vs.

THOMAS W. WOLF, in his official capacity as
Governor of the Commonwealth of Pennsylvania,
and RACHEL LEVINE, MD, in her official
capacity as Secretary of the Pennsylvania
Department of Health,

             Defendants.

CIVIL DIVISION

NO.   2:20-cv-2008

**COMPLAINT IN CIVIL ACTION**
**SEEKING A DECLARATORY**
**JUDGMENT, INJUNCTIVE**
**RELIEF, AND DAMAGES**

Filed on behalf of Plaintiff:
Robert A. McCafferty

Counsel of Record for this Party:

Rebecca L. Black, Esquire
PA I.D. #309127

LUTZ PAWK & BLACK
The NexTier Center Building
101 East Diamond Street, Suite 102
Butler, PA 16001
(724) 285-3400

JURY TRIAL DEMANDED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT A. MCCAFFERTY,<br>individually and doing business as<br>NORTH COUNTRY BREWING COMPANY,<br><br>　　　　　　Plaintiffs,<br><br>　　　vs.<br><br>THE HON. THOMAS W. WOLF, in his official<br>capacity as Governor of the Commonwealth of<br>Pennsylvania, and RACHEL LEVINE, MD,<br>in her official capacity as Secretary of the<br>Pennsylvania Department of Health,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL DIVISION<br><br>NO.　2:20-cv-2008 |

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES

AND NOW, comes the Plaintiff, Robert A. McCafferty, individually and doing business as North Country Brewing Company, by and through his attorneys, LUTZ PAWK & BLACK, and REBECCA L. BLACK, ESQUIRE, and files the within Complaint in Civil Action, setting forth as follows:

### INTRODUCTION

… [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all **substantial arbitrary impositions and purposeless restraints**, …and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment."

Moore v. E. Cleveland, 431 U.S. 494, 501-02, 97 S. Ct. 1932, 1936-37, 52 L.Ed.2d 531, 538-39 (1977) (emphasis added) (quoting *Poe* v. *Ullman,* 367 U.S. 497, 542-543 (dissenting opinion)).

1.     The instant action is based upon the Executive Orders issued by Pennsylvania Governor Thomas Wolf and Secretary of Health Rachel Levine, which have decimated the restaurant and bar industry.

2.     Defendants Wolf and Levine have intentionally manipulated the data generated from their own contact tracing measures conducted throughout Pennsylvania.

3.     Despite Defendants' data establishing that well over 90% of the COVID-19 cases in Pennsylvania resulted from exposure at locations **other than** restaurants and bars, Defendants have repeatedly stated otherwise to the media and residents of the Commonwealth.

4.     Defendants have intentionally misrepresented the data upon which they have relied, and upon which each of Defendants' Orders were based, and such intentional misrepresentations have eroded the consumer confidence in the restaurant industry, causing irreparable harm to Plaintiff.

5.     Defendants' Orders restricting and prohibiting Plaintiff from operating his restaurant businesses are entirely unsupported and constitute an arbitrary abuse of the powers granted to Defendants by virtue of the current state of emergency.

6.     Defendants have employed the emergency powers as an instrument of oppression, and flouted the mandates of the United States Constitution.

7.     Restaurants and bars have been unfairly targeted, and Plaintiff's restaurant business will be irreparably harmed if the Defendants' Orders are not immediately rescinded.

8.     Defendants' Orders and restrictions are best characterized as arbitrary impositions and purposeless restraints upon Plaintiff's rights.

## PARTIES, JURISDICTION, AND VENUE

9.      Plaintiff Robert A. McCafferty is an adult individual doing business as North Country Brewing Company, with a business address of 141 South Main Street, Slippery Rock, PA 16057.  North Country Brewing Company owns and operates three establishments at separate locations in Butler County:  two restaurants, North Country Brew Pub and The Harmony Inn, and; taproom and production facility, North Country Canning and Taproom (all referred to herein, collectively, as "North Country," or "Plaintiff").

10.     Defendant, Governor Thomas W. Wolf, named in his official capacity, is the Governor of the Commonwealth of Pennsylvania and is generally charged with enforcing the laws of the Commonwealth of Pennsylvania ("Governor Wolf").  Governor Wolf has a principal office address of 508 Main Capitol Building, Harrisburg, Pennsylvania, 17120.

11.     Defendant Rachel Levine, MD, named in her official capacity, is the Secretary of the Commonwealth of Pennsylvania Department of Health and is generally charged with enforcing the laws regarding the public health of the Commonwealth of Pennsylvania ("Secretary Levine").   Secretary Levine has a principal office address of: Pennsylvania Department of Health, Health and Welfare Building, 8th Floor West, 625 Forster Street, Harrisburg, Pennsylvania, 17120.

12.     Both Defendants are sued in their official capacities only, and are collectively referred to herein as "Defendants."

13.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343(a)(3)(4), which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

14.     This Court has jurisdiction to grant declaratory judgments and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

15.     The instant action is brought pursuant to 42 U.S.C. § 1983 and Plaintiff seeks specific remedies as provided by 42 U.S.C. § 1988.

16.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to Plaintiff's claim occurred in this district.

## FACTUAL BACKGROUND

### DEFENDANTS' ORDERS

17.     On March 6, 2020, Defendant Wolf declared a disaster emergency throughout the Commonwealth of Pennsylvania as a result of COVID-19; this emergency declaration was extended by amendments on June 3, 2020, August 31, 2020, and November 24, 2020.

18.     On March 16, 2020, Governor Wolf announced statewide mitigation efforts to go into effect approximately 9 hours later, at 12:01a.m. on March 17, 2020, and were to continue for fourteen (14) days. These mitigation efforts included a mandate that "all restaurants and bars close their dine-in facilities to help stop the spread of COVID-19," while "strongly urg[ing]" all non-essential businesses to close temporarily.

19.     On March 19, 2020, Defendants issued an Executive Order which prohibited the operation of all but life-sustaining businesses throughout the Commonwealth of Pennsylvania, and reinforced the March 17, 2020 Order that all restaurants and bars close their dine-in facilities. A copy of the Order is attached hereto as Exhibit "A." Each of the referenced Orders were mirrored by Orders simultaneously issued by the Secretary of Health. This order and subsequent orders issued by both Defendants, and addressed herein, are incorporated by reference and collectively cited to herein as "Defendants' Orders."

20.     On March 23, 2020, Defendants issued a stay-at-home order stating, "[a]ll individuals residing in the Commonwealth are ordered to stay-at-home except as needed to access, support, or provide life sustaining business, emergency, or government services." The stay-at-home requirements have since been suspended, but Defendants may unilaterally reinstate "stay-at-home" requirements at any time.

21.     On May 1, 2020, Defendants announced a plan to begin a phased reopening of the Commonwealth of Pennsylvania.

22.     On June 3, 2020, Defendants renewed the proclamation of disaster emergency for an additional ninety (90) days.

23.     On July 15, 2020, Defendants issued an order imposing new limitations on businesses in the food service industry. The order contained a limit of twenty-five percent (25%) of the stated fire code maximum occupancy for indoor dining, along with a provision that consumption of alcohol was permitted only when served in the same transaction as a meal.

24.     The Press Release issued with the July 15, 2020 Order also included the following:

The State has identified three catalysts for case increases:

- First, some Pennyslvanians have been ignoring mask-wearing requirements and social distancing when they are visiting Pennsylvania bars and restaurants. There they are unknowingly spreading or picking up the virus.
- Second is out-of-state travel. Both by Pennsylvanians returning from travel to hotspot states, and travelers visiting our Commonwealth from those hotspots.
- And third, a lack of national coordination has resulted in states in the south and west not committing to social distancing.

25.     No factual support was offered for the "catalysts" identified by Defendants, and it is believed and averred that no such factual support existed at the time.

26.     As indicated in an August 14, 2020 Press Release, at the time of the July 15, 2020 Order, Defendants had not yet begun gathering or reviewing contact-tracing data relative to potential exposure at various businesses or categories of businesses; indeed, they just began asking the such questions two days earlier.[1]

27.     On August 31, 2020, Defendants renewed the emergency declaration for another ninety (90) days.  There is no stated limit on the number of times Defendants may renew the declaration.

28.     There are no end dates to Defendants' Orders; even where end dates have been contemplated, they have been repeatedly extended or delayed, or have morphed into slightly modified versions of prior restrictions, leading to a seemingly endless shutdown.

29.     On December 10, 2020, Defendants issued yet another Order, effective December 12, 2020, at 12:01 a.m.[2] ("December 10 Order").   A true and correct copy of the December 10 Order is incorporated herein and attached hereto as Exhibit "B."

30.     The December 10, 2020 Order is titled "Order of the Governor of the Commonwealth of Pennsylvania Directing Limited-Time Mitigation."

31.     In imposing Defendants' Orders, Defendant Wolf has relied upon Section 7301 of the Emergency Management Services Code, 35 Pa. C.S. 7301.

32.     In addition, the December 10 Order, as well as each of the other Defendants' Orders, authorizes the Secretary of Health to initiate "general control measures, including, but

---

[1] August 14, 2020 Press Release, available at: Pennsylvania Shares Update on COVID-19 Early Warning Monitoring Dashboard, Cases Among Businesses, Age Groups (pa.gov); ("Case investigator notes included frequent mentions of visits to bars and restaurants among positive case. To better understand this emerging trend, on July 13, contact tracers began asking more specific questions on types of businesses visited and if individuals attended a mass gathering, defined as more than 250 people in attendance outdoors or more than 25 indoors.")

[2] Again, Orders were issued by both Defendants, separately, but are essentially identical to each other.

not limited to, closure, isolation, and quarantine," further relies upon the authority granted to the Secretary of Health pursuant to the Disease Prevention and Control Law, the Administrative Code of 1929, and the Department of Health Regulations. See 35 P.S. § 521.5; 71 P.S. §§ 532(a), and 1403(a); 28 Pa. Code § 27.60.[3]

33.     Defendants' Orders state that "despite all efforts taken to date, the pandemic continues to spread, and taking action to prevent that spread while continuing to allow for necessary resumption of economic and social activity requires the Commonwealth to take steps to minimize the danger to Pennsylvanians as a result of participating in that activity[.]" (emphasis added).

34.     The December 10 Order specifically provides, relative to in-person Dining and Alcohol Sales:

A.     All in-person indoor dining at businesses in the retail food services industry, including but not limited to, bars, restaurants, breweries, wineries, distilleries, social clubs, and private catered events is prohibited.

B.     Outdoor dining, take-out food service and take-out alcohol sales are permitted and may continue, subject to any limitations or restrictions imposed by Pennsylvania law, or this or any other Order issued by me or the Secretary of Health.

35.     The December 10 Order imposes a blanket prohibition on indoor dining, without regard for mitigation measures or efforts taken by Plaintiff or any other restaurant.

**CDC GUIDELINES AND PENNSYLVANIA CONTACT TRACING REPORTS**

36.     Defendants' Orders are overly restrictive and inconsistent in comparison to the available statistical data and health precautions recommended by the United States Center for Disease Control (CDC).

---

[3] The Secretary of Health issued an identical Order on the same date, imposing the same restrictions.

37.    As stated on the CDC Website:

> ... there are a number of actions operators of restaurants and bars can take to help lower the risk of COVID-19 exposure and spread. Personal prevention practices (such as handwashing, staying home when sick, and wearing masks) and workplace prevention practices, like environmental cleaning and disinfection, are important principles of preventing the spread of COVID-19.

38.    Plaintiff has implemented every action and strategy recommended by the CDC to promote mitigation and prevent the spread of COVID-19 at restaurants and bars, at a great cost to Plaintiff.

39.    Rather than imposing restrictions based upon the CDC-established mitigation strategies, Defendants' Orders are based on contact-tracing data that is flawed, studies that fail to account for mitigation efforts successfully employed by the restaurant industry, and data gathered from sources and studies outside of the State of Pennsylvania, acknowledging that Defendants are not even aware of studies conducted within Pennsylvania.[4]

40.    Defendants have been requested, on several occasions and by several entities, to provide data supporting or justifying the disproportionate limitations and restrictions placed upon the restaurant and bar industries, but have failed to do so.

41.    The first data released from Defendants, relative to contact tracing connected to businesses, was released through a press release on August 14, 2020.

42.    Despite having ordered the closure of bars and restaurants months earlier, the August 14 Press Release indicates that contact tracers did not even begin asking specific questions about visiting bars or restaurants until July 13, 2020.

---

[4] During the December 10, 2020 Press Conference, Defendants were asked whether they were aware of, or relying on, statistics generated through studies actually conducted in the Commonwealth. In response, Defendants passed the question to Dr. Meda Higa, who acknowledged that she was unaware of any studies conducted in Pennsylvania, but insisted that the out-of-state studies are nonetheless applicable, because "there is nothing unique about restaurants in Pennsylvania."

43.     Specifically, the August 14 Press Release stated that "Case investigator notes included frequent mentions of visits to bars and restaurants among positive cases.  To better understand this emerging trend, on July 13, contact tracers began asking more specific questions on types of businesses visited and if individuals attended a mass gathering, defined as more than 250 people in attendance outdoors or more than 25 people indoors."

44.     Despite the fact that contact tracers were only just beginning to ask these questions, just two days later, on July 15, 2020, Defendants issued an order imposing specific limitations on businesses in the food service industry, apparently because contact tracers noticed an "emerging trend," or perhaps because other states were doing so, despite the fact that definitive data on such "trend" in Pennsylvania had not yet been obtained.

45.     Also important to note is that because the contact tracers began asking the business-related questions in July, it follows that Defendants did not have such data when they Ordered the initial shutdown of restaurants and bars in March.

46.     The data that has been released to this point is flawed and the Defendants' statements and representations based upon such data constitute brazen and intentional misrepresentations.

47.     Although lengthy, a review of Defendants' Press Releases from August through December, which have allegedly served as justification for Defendants' Orders, is necessary in order to demonstrate the extent of the data manipulation and misrepresentation employed by Defendants. Indeed, the contact tracing data produced in the Press Releases serves as the only data relied upon by Defendants and generated within this Commonwealth. True and correct copies of each referenced Press Release are attached hereto, collectively, as Exhibit "C."

48.     As stated, Defendants first began releasing the data upon which their mitigation

decisions were based on August 14, 2020, though it was incomplete.[5]

49.     In an August 14, 2020 Press Release, the following data was reported:

a.     There were **24,468** confirmed COVID-19 cases between July 13 and August 11,
2020.

b.     Of the 24,468, "less than half of the individuals" provided a response to the
business-related contact tracing questions ("responding individuals"). Although
the actual number of responding individuals was not provided by Defendants, the
press release indicates that 1,499 is 13% of the responding individuals. To that
end, it is presumed that total responding individuals was **11,530**.

c.     Of 11,530 responding individuals, **10,826** contracted COVID and **did not** visit
any business establishment within 14 days prior to the onset of symptoms.

d.     **Only 704** of the responding individuals indicated that they had gone to a
restaurant within 14 days prior to the onset of symptoms; **this amounts to six
percent (6%) of the total responding individuals**, and less than three percent
(3%) of the total positive cases.

e.     **Only 360** of the responding individuals indicated that they had gone to a bar
within 14 days prior to the onset of symptoms; this amounts to **three percent
(3%)** of the total responding individuals, and one and a half percent (1.5%) of the
total positive cases reported.

f.     Based upon Defendants' data, at least ninety-four percent **(94%)** of responding
individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and
ninety-seven percent **(97%)** of responding individuals **did not** visit a bar 14 days
prior to the onset of symptoms; this calculation is notably absent from
Defendants' Press Release, though.

50.     That is, as early as August 14, 2020, Defendants were aware that their own data

connected only 6% of Pennsylvania's COVID cases to the restaurant industry. Despite this

knowledge, Defendants continued to unjustly and unreasonably restrict Plaintiff from operating

---

[5] The press release indicates a case total of 24,468 between July 13 and August 11, and states that "less than half of
the individuals provided an answer to the question as to whether they spent time at a business establishment," which
further indicates the lack of importance to Defendants of the case numbers that have no connection to businesses.
Moreover, the data provided does not identify within which Pennsylvania counties the contact tracing connections
to the restaurant industry were generated. Surely, it would be important to know if all of the responding individuals
visiting a restaurant within the applicable period visited restaurants only in Philadelphia, for example. That
information has not been provided in any of the weekly Press Reports.

his businesses.

51.     The data released in an August 24, 2020 Press Release painted a similar picture,

indicating as follows:

    a.  There were **5,649** confirmed COVID-19 cases between August 9 and August 15, 2020.

    b.  Of the 5,649, **2,451** (45%) provided a response to the business-related contact tracing questions ("responding individuals").

    c.  Only **159** of those individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; **this amounts to 6% (six percent) of the responding individuals**, and less than 3% of the total positive cases reported.

    d.  **55** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2% (two percent)** of the total responding individuals, and 0.97% of the total positive cases reported.

    e.  Based upon Defendants' data, ninety-four percent **(94%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation is, again, notably absent from Defendants' press release.

    f.  Without data concerning the individuals who did not respond to contact tracing questions, one would have to assume that the data would follow those who did respond in similar percentages.

52.     In the August 31, 2020 Press Release, the data relative to contact tracing was

reported as follows:

    a.  There were **4,536** confirmed COVID-19 cases between August 16 and August 22, 2020.

    b.  Of the 4,536, **2,093** (46%) provided answers to the applicable contact-tracing questions.

    c.  **134** of those individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; **this amounts to 3% (three percent) of the total positive cases reported, and 6% of the responding individuals**.

    d.  At least **1,959** of the responding individuals contracted COVID without having visited a restaurant, and 1,825 responding individuals contracted COVID without

having visited a business of any kind.

e. Defendants do not use that calculation, though; rather, they assert that, of the 2,093 individuals who responded to the contact-tracing questions, **268** reported having visited a business establishment 14 days prior to the onset of symptoms, and that half of **those** 268 individuals who visited a business, indicated that they visited a restaurant, so it is somehow appropriate to allege that their data established that patronizing a restaurant accounts for approximately 50% of the COVID cases during that time period.

53.     To illustrate the absurdity of this method and these conclusions: if you exclude all of the answers that do not say what you want, you will always reach the conclusion you desire. That is, if you do not factor in the thousands of individuals who contracted COVID and reported that they did <u>not</u> visit a business establishment of any kind, you will have already excluded the vast majority of COVID-positive patients.   If you then base your calculations and percentages only on the individuals who indicated that they visited a business establishment, the result will be an artificially-inflated "connection" to all of the various types of businesses.

54.     Stated another way, in an effort to distort the figures and paint a more drastic and significant tie to the restaurant industry than actually exists in their very own data, the Defendants automatically excluded every COVID-positive individual who provided contact tracing information and <u>did not visit a business establishment 14 days prior to the onset of symptoms</u>.

55.     The number excluded by Defendants in these calculations is, in fact, very significant: based upon the Defendants' data in the August 31 Press Release, **<u>eighty-seven</u>** **<u>percent (87%)</u>** of COVID-positive individuals who responded to contact tracing <u>did not visit a</u> <u>business establishment</u>, not just a restaurant but any business establishment, with the 14 days prior to the onset of symptoms.

56.     Determining the point of exposure for that 87% of COVID-positive individuals is necessary to determine appropriate mitigation techniques, and the exclusion of such information results in mitigation efforts that have a disproportionately harsh effect on businesses.

57.     Moreover, according to the data in Defendants' August 31 Press Release, **at least ninety-four percent (94%)** of Co-Vid-positive individuals who provided contact tracing information **did not** visit a restaurant 14 days prior to the onset of symptoms.[6]

58.     Defendants were aware in August that a significant number, an overwhelming majority, in fact, of COVID-positive individuals contracted COVID without having been exposed at a restaurant or bar; a press release indicating that only 3-6% of positive cases had any connection to the restaurant industry does not fit within the Defendants' narrative, though.

59.     In a September 8, 2020 Press Release, the following data was reported:

    a.  There were **4,442** confirmed COVID-19 cases between August 23 and August 29, 2020.

    a.  Of the 4,442, **1,953** (44%) provided a response to the business-related contact tracing questions ("responding individuals").

    b.  **157** of those individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **8%** of the responding individuals, and **3.5%** of the total positive cases reported.

    c.  **29** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.5% of responding individuals**, and less than one percent (0.65%) of the total positive cases reported.

    d.  Based upon Defendants' data, ninety-two percent **(92%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and over ninety-eight percent **(>98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

60.     In a September 14, 2020 Press Release, the following data was reported:

    a.  There were **5,735** confirmed COVID-19 cases between August 30 and September 5, 2020.

    b.  Of the 5,735, **2,154** (37%) provided a response to the business-related contact tracing questions ("responding individuals"). Of the responding individuals, only **274** visited a business establishment of any type 14 days prior to the onset of

---

[6] If calculated based upon the total positive cases, rather than the total responding to contact tracing, 4,402 of the positive cases did not report a tie to the restaurant industry, which amounts to 97%.

symptoms.

c.  **41** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **6.5%** of the responding individuals, and **2.5%** of the total positive cases reported.

d.  **38** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.8% of responding individuals**, and less than one percent (0.66%) of the total positive cases reported.

e.  Based upon Defendants' data, over ninety-three percent **(93%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and over ninety-eight percent **(>98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

61.   In Defendants' September 21, 2020 Press Release, the following data was reported:

a.  There were **5,188** confirmed COVID-19 cases between September 11 and September 17, 2020.

b.  Of the 5,188, **1,992** (38%) provided a response to the business-related contact tracing questions ("responding individuals"), and 1,720 of those individuals did not visit a business establishment of any kind.

c.  **136** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **6.8%** of the responding individuals, and 2.6% of the total positive cases reported.

d.  **6** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.8% of responding individuals**, and less than one percent (0.69%) of the total positive cases reported.

e.  Based upon Defendants' data, over ninety-three percent **(93%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and over ninety-eight percent **(>98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms.

62.   In Defendants' September 28, 2020 Press Release, the following data was reported:

a.  There were **5,747** confirmed COVID-19 cases between September 13 and September 19, 2020.

b.  Of the 5,649, **2,405** (42%) provided a response to the business-related contact tracing questions ("responding individuals").

c.  **194** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; **this amounts to 8% (eight percent) of the responding individuals**, and 3.4% of the total positive cases reported.

d.  **42** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.7% of responding individuals**, and less than one percent (<1%) of the total positive cases reported.

e.  Based upon Defendants' data, ninety-two percent **(92%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and over ninety-eight percent **(>98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

63.  In Defendants' October 5, 2020 Press Release, the following data was reported:

a.  There were **5,722** confirmed COVID-19 cases between September 20 and September 26, 2020.

b.  Of the 5,722, **2,252** (39%) provided a response to the business-related contact tracing questions ("responding individuals"), and 1,925 of those individuals did not visit a business of any kind.

c.  **165** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **7% of the responding individuals**, and 2.9% of the total positive cases reported.

d.  **40** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.8% of responding individuals**, and less than one percent (0.7%) of the total positive cases reported.

e.  **93%** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and over ninety-eight percent **(>98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

64.  In an October 13, 2020 Press Release, the following data was reported:

a.  There were **6,812** confirmed COVID-19 cases between September 27 and October 3, 2020.

b.  Of the 6,812, **2,599** (38%) provided a response to the business-related contact tracing questions ("responding individuals"), and 2,165 of those individuals did

not visit a business of any kind.

c. **231** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **less than 9%** of the responding individuals, and 3.4% of the total positive cases reported.

d. **63** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2% of responding individuals**, and less than one percent (0.9%) of the total positive cases reported.

e. More than **91%** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and **98%** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms.

65. In Defendants' October 19, 2020 Press Release, the following data was reported:

a. There were **8,580** confirmed COVID-19 cases between October 4, 2020 and October 10, 2020.

b. Of the 8,580, **2,820** (33%) provided a response to the business-related contact tracing questions ("responding individuals"), and 2,336 of those individuals did not visit a business of any kind.

c. **243** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **8.6%** of the responding individuals, and **2.8%** of the total positive cases reported.

d. **69** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2.4% of responding individuals**, and **less than one percent (0.8%)** of the total positive cases reported.

e. Approximately ninety-two percent **(92%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

66. The following data was reported in Defendants' October 26, 2020 Press Release:

a. There were **9,754** confirmed COVID-19 cases between October 11, 2020 and October 17, 2020.

b. Of the 9,754, **2,841** (29%) provided a response to the business-related contact tracing questions ("responding individuals"), and 2,377 responding individuals did not visit a business of any kind.

c.  **256** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **9%** of the responding individuals, and 2.6% of the total positive cases reported.

d.  **61** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2%** of responding individuals, and less than one percent (0.6%) of the total positive cases reported.

e.  Approximately ninety-one percent **(91%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms.

67.  In a November 2, 2020 Press Release, the following data was reported:

a.  There were **11,926** confirmed COVID-19 cases between October 18, 2020 and October 24, 2020.

b.  Of the 11,926, **2,809** (24%) provided a response to the business-related contact tracing questions ("responding individuals").

c.  83% of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

d.  **278** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **9.9%** of the responding individuals, and **2.3% of the total positive cases reported**.

e.  **58** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2% of responding individuals**, and **less than one percent (0.5%)** of the total positive cases reported.

f.  Over ninety percent **(90%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

68.  In a November 9, 2020 Press Release, the following data was reported:

a.  There were **15,412** confirmed COVID-19 cases between October 25, 2020 and October 31, 2020.

b.  Of the 15,412, **3,244** (21%) provided a response to the business-related contact tracing questions ("responding individuals").

    c.   81.3% of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

    d.   **332** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **10%** of the responding individuals, and **2.1%** of the total positive cases reported.

    e.   **80** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2.5%** of responding individuals, and less than one percent (0.5%) of the total positive cases reported.

    f.   Approximately ninety percent **(90%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

69.    In a November 16, 2020 Press Release, the following data was reported:

    a.   There were **20,985** confirmed COVID-19 cases between November 1, 2020 and November 7, 2020.

    b.   Of the 20,985, **3,327** (16%) provided a response to the business-related contact tracing questions ("responding individuals").

    c.   84% of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

    d.   **284** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **8.5%** of the responding individuals, and **1.4%** of the total positive cases reported.

    e.   **67** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2%** of responding individuals, and less than one percent (0.3%) of the total positive cases reported.

    f.   Approximately ninety-two percent **(92%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

70.    In a November 23, 2020 Press Release, the following data was reported:

    a.   There were **34,719** confirmed COVID-19 cases between November 8, 2020 and November 14, 2020.

b. Of the 34,719, **3,619** (10%) provided a response to the business-related contact tracing questions ("responding individuals").

c. **87%** of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

d. **233** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **6.4%** of the responding individuals, and **0.7%** of the total positive cases reported.

e. **74** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **2%** of responding individuals, and less than one percent (0.2%) of the total positive cases reported.

f. Approximately ninety-two percent **(94%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

71. In a November 30, 2020 Press Release, the following data was reported:

a. There were **44,525** confirmed COVID-19 cases between November 15, 2020 and November 21, 2020.

b. Of the 44,525, **3,038** (7%) provided a response to the business-related contact tracing questions ("responding individuals").

c. **87%** of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

d. **200** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **6.6%** of the responding individuals, and **0.4%** of the total positive cases reported.

e. **60** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.97%** of responding individuals, and less than one percent (0.1%) of the total positive cases reported.

f. Approximately ninety-two percent **(94%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

72. In a December 7, 2020 Press Release, the following data was reported:

   a. There were **46,653** confirmed COVID-19 cases between November 22, 2020 and November 28, 2020.

   b. Of the 46,653, **2,085** (4.5%) provided a response to the business-related contact tracing questions ("responding individuals").

   c. **88.4%** of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

   d. **116** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **11%** of the responding individuals, and **0.5%** of the total positive cases reported.

   e. **38** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.8%** of responding individuals, and less than one percent (0.08%) of the total positive cases reported.

   f. Approximately eighty-nine percent **(89%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

73. In a December 14, 2020 Press Release, the following data was reported:

   a. There were **62,693** confirmed COVID-19 cases between November 29, 2020 and December 5, 2020.

   b. Of the 62,693, **2,746** (4.4%) provided a response to the business-related contact tracing questions ("responding individuals").[7]

   c. **91%** of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

   d. **125** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **4.5%** of the responding individuals, and **0.2%** of the total positive cases reported.

   e. **21** of the responding individuals indicated that they had gone to a bar within 14

---

[7] It should be noted that the Press Releases from November 23, 2020 forward indicate that case investigations are being "prioritized." It is unknown from the Press Releases whether individuals are not responding, or whether thousands of individuals are just not being contacted. It is believed and therefore averred that Defendants' did not employ sufficient manpower to conduct contact tracing once the number of positive cases increased substantially. No further information is provided as far as how the investigations are prioritized, or whether investigators are directed to pursue certain cases more fervently than others.

days prior to the onset of symptoms; this amounts to **0.76%** of responding individuals, and less than one percent (0.03%) of the total positive cases reported.

f.   Approximately eighty-nine percent **(89%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-eight percent **(98%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

74.   Finally, in a December 21, 2020 Press Release, the following data was reported:

a.   There were **71,341** confirmed COVID-19 cases between December 6, 2020 and December 12, 2020.

b.   Of the 71,341, **2,936** (4.1%) provided a response to the business-related contact tracing questions ("responding individuals").

c.   91% of the responding individuals contracted COVID without having visited **any** business establishment in the 14 days prior to the onset of symptoms.

d.   **100** of the responding individuals indicated that they had gone to a restaurant within 14 days prior to the onset of symptoms; this amounts to **3.4%** of the responding individuals, and **0.14%** of the total positive cases reported.

e.   **36** of the responding individuals indicated that they had gone to a bar within 14 days prior to the onset of symptoms; this amounts to **1.2%** of responding individuals, and less than one percent (0.05%) of the total positive cases reported.

f.   Approximately ninety-seven percent **(97%)** of responding individuals **did not** visit a restaurant 14 days prior to the onset of symptoms, and approximately ninety-nine percent **(99%)** of responding individuals **did not** visit a bar 14 days prior to the onset of symptoms; this calculation remains absent from Defendants' press release.

75.   The reason it was important to reproduce the data reported in each of the published weekly Press Releases above, is that not a single Press Release contains data in line with what Defendants' have claimed…not one.

76.   Defendants' data also fails to identify the number of responding individuals that attended both a restaurant and a mass gathering, or a restaurant and several other business establishments.   That is, if each of the responding individuals that indicated that they visited a

restaurant in the 14 days prior to the onset of symptoms also attended a mass gathering in the same time frame, the connection between COVID-19 exposure and the restaurant industry becomes even more strained.

77.     Moreover, there has been no demonstration by Defendants that any effort was put in to determining the source of exposure to the individuals who <u>did not</u> visit a business establishment in the 14 days leading up to the onset of symptoms.

78.     The only thing the referenced data serves to establish is that more than 90% of the positive COVID-19 cases resulted from exposure in locations **other than** restaurants.

79.     That is, while an individual indicating that he or she visited a restaurant within the applicable time period may establish the *possibility* that such restaurant was the source of exposure, it carries absolutely no level of certainty; on the other hand, an individual who did not visit a restaurant during the applicable period definitively did not contract COVID from exposure at such a location.

80.     This is further demonstrated by the statement present in nearly all of the Press Releases: "The numbers above highlight business settings and mass gatherings as <u>possible</u> sites for transmission." (emphasis added).

81.     Of course business settings and mass gatherings are possible sites for transmission, along with every other conceivable location.

82.     Clouding the reports even more, one of the categories in the contact-tracing data is "some other business establishment," with no explanation of what such category is stated as including, or not including, to the responding individuals.

83.     Speculation is insufficient when used to close businesses and deprive individuals

of their constitutional rights.

84.     As it concerns bars, the data provided by Defendants to support their enhanced restrictions on bars is even more attenuated.

85.     Moreover, no data at all has been released that would demonstrate a connection between consuming alcohol after a certain time and contracting COVID-19, though the September 17 Orders specify that on-site alcohol consumption must end at 11:00pm.

86.     For nine months, Defendants have been instilling fear in the residents of the Commonwealth, informing them that the restaurant and bar industry is responsible for half of the COVID-19 cases and that the closure of such businesses will prevent the spread of COVID, based upon a blatant misrepresentation and manipulation of their own data.

87.     In reality, what the referenced numbers actually highlight is that the vast majority of COVID cases were contracted <u>outside</u> of the business setting altogether.[8]

88.     If Defendants' contact-tracing data is to be believed, that means that, in any given week, approximately 85% of responding individuals contracted COVID despite having not visited a business establishment at all.

89.     Defendants' Orders are disproportionate to the actual health risks, as traditional disease control measures, such as isolation for the ill, face coverings, distancing, and enhanced sanitation measures, would achieve the same interests in a less-restrictive manner.

90.     Defendants' Orders are overbroad and exceed legitimate government need and authority.

91.     The state interests can be more narrowly achieved through less broad and

---

[8] As indicated, based on Defendants' data, between 85% and 90% of responding COVID-positive individuals did not visit a business at all 14 days prior to the onset of symptoms.

intrusive means than imposed through Defendants' Orders.

92.     Defendants' Orders continue to restrict Plaintiff's right to operate his business.

93.     Defendants' Orders are disproportionately restrictive of Plaintiff's constitutional rights relative to the potential public health risks that are sought to be addressed.

94.     Plaintiff has implemented safety precautions that are proportionate to the public health risks and consistent with the CDC statistics and regulations, and has ensured compliance with such precautions by his employees and customers.

95.     Plaintiff has not been made aware of a single case of COVID-19 having traced back to potential exposure at his businesses, and his businesses have not suffered from any outbreaks.

96.     Defendants' Orders have deprived Plaintiff of the economic benefit and use of his property without due process of law or compensation, resulting in a loss of $2,059,278 in sales, as compared to 2019, and an 83% decrease in profit from last year, with Plaintiff's lost profit totaling over $746,710 to date and increasing daily.

97.     Additionally, the incredibly short notice to Plaintiff of such Orders resulted in over $30,000 lost in food expenses from the March shutdown, over $10,000 lost in wasted food from the last-minute shutdown over Thanksgiving, and over $20,000 lost in wasted food from the current shutdown.

98.     Defendants' Orders have forced Plaintiff to lay off the majority of his employees.

99.     Defendants' Orders have caused irreparable harm to Plaintiff's business and livelihood, and will continue to do so unless immediately rescinded.

100.    Defendants' Orders will continue to harm Plaintiff's business, as Defendants'

intentional misrepresentations have irreparably diminished consumer confidence in the restaurant industry as a whole.

101.    Defendants' Orders deprive Plaintiff of his right to work for a living to financially support himself and his family.

102.    Plaintiff has standing because the Defendants' Orders have infringed upon Plaintiff's constitutional rights and caused Plaintiff severe financial hardship and loss of the use of his property.

103.    Plaintiff's claims are ripe for disposition because Defendants' Orders continue to violate Plaintiff's constitutional rights.  The portion of Defendants' Orders that are suspended may be unilaterally reinstated at any time, and Defendants' December 10, 2020 Order remains in full force and effect, and will likely be extended repeatedly, as has been the case with Defendants' prior Orders initially issued more than nine (9) months ago.

## COUNT I

## VIOLATION OF EQUAL PROTECTION – 42 U.S.C. § 1983

104.    The allegations contained in the foregoing paragraphs are incorporated as though fully set forth herein.

105.    The Equal Protection Clause of the Fourteenth Amendment prohibits Defendants from denying to individuals in the Commonwealth equal protection of the laws.  *See* U.S. CONST. AMEND. XIV.

106.    As stated by the United States Supreme Court, the Equal Protection Clause "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities

imposed." *Hayes* v. *Missouri,* 120 U.S. 68, 71-72, 7 S. Ct. 350, 30 L. Ed. 578 (1887).

107.    "When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 602, 128 S. Ct. 2146, 2153, 170 L.Ed.2d 975, 986 (2008) *(quoting Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)).

108.    "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Willowbrook,* 528 U.S. at 564 (*quoting Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 445).

109.    In its simplest terms, the Equal Protection Clause requires state actors to act in a rational and non-arbitrary manner, and treat one class of individuals the same as other similarly situated individuals.

110.    Defendants' actions, here, are arbitrary and fail equal protection scrutiny.

111.    Plaintiff's businesses have been treated differently by Defendants than other substantially similar businesses and business owners, despite the lack of any reasonable or rational basis for such different treatment; Defendants' actions in treating Plaintiff differently than other similarly situated businesses were intentional and with knowledge that such actions

were unsupported by their own data.

112.    The percentage occupancy limits and the recent ban on indoor dining imposed upon Plaintiff's business are arbitrary in that similar businesses that present equal or greater risk of COVID exposure are not subject to the same restrictions.

113.    Moreover, as set forth above, Defendants' businesses are subject to mandatory closure orders and restrictions on operation, despite the fact that Defendants' own data links restaurants and bars to less than 10% of COVID cases in Pennsylvania.

114.    Plaintiff has taken all action to ensure that person-to-person contact is limited or avoided at each of his business locations, has enforced mask and face-covering requirements, has eliminated the sharing of table items and menus, and has distanced the tables available so that the customers avoid contact with others at the restaurants. Plaintiff also created and distributed a "COVID Safety Packet" to each of its managers upon reopening in June, and imposed requirements on all employees relative to cleaning, sanitizing, taking and monitoring temperatures, and precautions to be taken with a potential sick individual.

115.    Customers are typically seated with either close friends or family members, with whom they would be in contact whether they visit Plaintiff's restaurants or not.

116.    In fact, what is evident from Defendants' data is that the vast majority of exposure occurs without any connection whatsoever to a business of any type. This is further indicated by the increase in cases following a holiday during which people around the country visit with family members. Moreover, the case numbers increased significantly following Thanksgiving, which was a period during which bars were subjected to additional closure orders, and restaurant operations were severely restricted. There has been no allegation that the increased case counts

during such period resulted from patronizing businesses.

117.    Defendants' repeated refusal to acknowledge the lack of a substantial connection between COVID exposure and restaurants is misleading and deceptive to the residents of the Commonwealth.

118.    Perhaps most shocking was Defendant Levine's assertion during the December 10, 2020 Press Conference that contact tracing and case investigations conducted throughout Pennsylvania earlier this year showed that restaurants and bars "were contributing significantly to the spread." The data she references actually shows the opposite, and she was aware of such data when making the referenced statement.

119.    The contact tracing in Pennsylvania, which would otherwise serve to establish a framework or basis for the restrictions imposed or the disparity of the restrictions imposed on different categories of businesses, has demonstrated that the restaurant industry is simply not to blame for the spread of COVID. Moreover, because the data demonstrates the opposite of what Defendants' have been portraying to the media and the public for more than nine months, Defendants have now asserted that their own data cannot be relied upon, because "it is impossible to do case investigations and contact tracing for that amount of people."[9]

120.    To that end, Defendants rely on data from other states with different demographics and generalize the findings, asserting that such results would be the same in Pennsylvania, because "there is nothing unique about restaurants in Pennsylvania."[10]

121.    However, prior to the substantial increase in cases, contact tracing was regularly conducted, and it demonstrated that at least 94% of positive COVID cases resulted from

---

[9] Secretary Levine, Press Conference, December 7, 2020.
[10] Dr. Meda Higa, Press Conference, December 10, 2020.

exposure without any connection to the restaurant industry.[11]

122.    The December 10 Order highlights the arbitrary nature of Defendants' decisions, as it prohibits specific categories of businesses from operation entirely, while allowing general categories of businesses, such as all other "in-person businesses serving the public," to continue operating at 50% capacity.

123.    By way of further illustration, Defendants' Orders permit a small group of people to travel to and from, and patronize, retail establishments together, to attend worship services together, to be seated on airplanes, buses, and trains together, to attend in-person gatherings of 10 people or less, attend an outdoor gathering with 50 people, work together, and to engage in countless other activities together, but they are prohibited from sitting across a table from one another for dinner at a sanitized restaurant with a server wearing a face mask.

124.    On any given day, there are more people in one aisle of Walmart than would be seated at a table in Defendants' restaurants, separated from other patrons.

125.    Even if operating at 50% capacity, patrons would not have as much contact with other customers as they do while walking through a retail establishment or grocery store.

126.    Unlike the typical environment at a retail store, Plaintiff's restaurants maintain distance between tables, prevent the sharing/touching of items such as menus or condiments, limit or entirely avoid close person-to-person contact, have plexiglass installed to separate the cashiers/servers from patrons, and have installed micron filters in the restaurants' existing systems to more thoroughly filter the air circulating among the employees and customers.

127.    The restrictions imposed upon Plaintiff through Defendants' Orders constitute

---

[11] See August Press Releases (94% of responding individuals who were COVID-positive in from July 13 through August 22, 2020 did not visit a restaurant in the 14 days prior to the onset of symptoms).

disparate treatment of Plaintiff as compared to others similarly situated and, thus, violate Plaintiff's Equal Protection rights.

128.    There is no rational basis for the targeting of the restaurant industry, when Defendants' own data established that the restaurant industry is not to blame and is not the source of the increasing COVID cases in Pennsylvania; and there is no rational basis for favoring other businesses which present the same, or increased, risk of exposure.

129.    Defendants actions have denied Plaintiff of his constitutional right to equal protection of the laws.

## COUNT II

## VIOLATION OF PROCEDURAL DUE PROCESS – 42 U.S.C. § 1983

130.    The allegations contained in the foregoing paragraphs are incorporated as though fully set forth herein.

131.    The Fourteenth Amendment to the United States Constitution forbids a state actor from depriving anyone of life, liberty, or property without due process of law.

132.    As stated by the United States Supreme Court,

Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint.

... [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ...and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

Moore v. E. Cleveland, 431 U.S. 494, 501-02, 97 S. Ct. 1932, 1936-37, 52 L.Ed.2d 531, 538-39 (1977) (*quoting Poe* v. *Ullman,* 367 U.S. 497, 542-543 (dissenting opinion)).

133.    The liberty to which Plaintiff is entitled is right to be free from the "substantial arbitrary impositions and purposeless restraints" placed upon his businesses.

134.    Plaintiff has a legitimate entitlement to operate his restaurants, as such is both a property right and a liberty right protected by procedural due process.

135.    Where a liberty or property interest falls within the ambit of the Fourteenth Amendment protections, a procedure by which an aggrieved party may be heard must be available.

136.    "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848, 97 S. Ct. 2094, 2112, 53 L.Ed.2d 14, 38 (1977) (*quoting Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972)).

137.    Defendants do not provide **any** procedural safeguards or mechanisms by which Plaintiff can meaningfully challenge the restrictive orders placed upon his businesses.

138.    So long as Defendants' continue to extend the proclaimed disaster emergency, Defendants' can seemingly operate without challenge, and without being called upon to validate or justify their actions.

139.   It is Defendant Wolf that declared the disaster emergency, and it is Defendant Wolf that will, eventually, end it.

140.   In the interim, there is no manner or mechanism by which any aggrieved party can challenge the legality of Defendants' Orders, seek judicial review of the Defendants' Orders, request a hearing, file an appeal of Defendants' determinations, request a waiver or modification from the Defendants' Orders, or demonstrate why the Defendants' Orders are not applicable to it.

141.   There is absolutely no mechanism providing an opportunity to be heard prior to the imposition of the restrictions and deprivation of rights associated with Defendants' Orders.

142.   As a result, Defendants' Orders violate the Due Process Clause of the Fourteenth Amendment.

## COUNT III

## VIOLATION OF SUBSTANTIVE DUE PROCESS – 42 U.S.C. § 1983

143.   The allegations contained in the foregoing paragraphs are incorporated as though fully set forth herein.

144.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects Plaintiff from the arbitrary, capricious, and irrational Orders of Defendants which interfere with Plaintiff's liberty and property interests.

145.   In addressing Substantive Due Process claims, the United States Supreme Court has said that:

> ...the Due Process Clause was intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression" ... To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.

*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 1717, 140 L.Ed.2d 1043, 1057 (1998) (quoting *Collins* v. *Harker Heights,* 503 U.S. 115, 126)).

146.    "[T]he substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."" *Id.*

147.    As demonstrated in Count II, above, the interests at issue in the instant matter include both property and liberty interests.

148.    The Defendants' Orders have imposed arbitrary restrictions upon Plaintiff's businesses, without justification, and while other businesses have been permitted to operate either without restriction or with less restrictions than those imposed upon Plaintiff.

149.    The decision to restrict capacity and order closure of Plaintiff's businesses is without any rational basis, contrary to the data upon which Defendants allegedly rely, and is arbitrary and unfair.

150.    Indeed, the arbitrary nature of Defendants' Orders can be shown by Defendants action in ignoring their own data when it failed to support their desired conclusion, and then misrepresenting it to the media and the public by alleging that it establishes something that it clearly does not.[12]

151.    Defendants' have failed to provide an explanation for the inconsistent and arbitrary methods of classification and restrictions placed upon businesses in the Commonwealth.

152.    Pursuant to the December 10 Order, "all in-person businesses serving the public

---

[12] As previously stated, Defendant Levine, during the December 10, 2020 Press Conference, asserted that <u>contact tracing and case investigations conducted throughout Pennsylvania</u> earlier this year showed that restaurants and bars "were contributing significantly to the spread," despite the fact that the referenced early data showed the opposite.

within a building or defined area" are permitted to operate at a 50% capacity, without regard for such businesses' ability to follow mitigation procedures.

153.    The December 10 Order permits retail establishments to operate at 50% capacity, despite the crowds in close quarters, which are increased or enhanced during the present holiday season.

154.    Defendants' Orders are illogical.

155.    Defendants' Orders have compelled the closure of all of Plaintiff's businesses, permitting Plaintiff to operate only as "take-out" or "delivery," and explicitly prohibiting indoor dining.

156.    Defendants have failed to provide relevant data supporting their closure orders, or substantiating their claims that the closure of restaurants and bars will mitigate the spread of COVID-19 in any meaningful way.

157.    The classification system and contact-tracing reports utilized by Defendants, and specifically as portrayed by Defendants, are arbitrary and capricious.

158.    The mandated closure of Plaintiff's businesses has rendered Plaintiff unable to operate his businesses and earn a living, and have, therefore, infringed upon his property and liberty rights.

159.    Even if the prohibition on indoor dining is lifted on January 4, 2021, the previously-imposed occupancy limits remain in effect and are, in and of themselves, arbitrary and unduly oppressive, as Plaintiff is unable to generate enough revenue to remain open at 25% capacity and such limitations remain unsupported by any data.

160.    Moreover, Defendants have failed to demonstrate that prohibiting or restricting

indoor dining mitigates the spread of COVID-19 in any meaningful way, or at all.

161.   Plaintiff has a protected liberty interest in his right to live and operate his businesses without arbitrary and coercive government action.

162.   Defendants have abused their powers, and have used the power granted to them by virtue of the state of emergency as an instrument of oppression; Defendants' Orders therefore violate the Due Process Clause of the Fourteenth Amendment.

## COUNT IV

## VIOLATION OF THE TAKINGS CLAUSE – 42 U.S.C. § 1983

163.   The allegations contained in the foregoing paragraphs are incorporated as though fully set forth herein.

164.   The closure of Plaintiff's restaurants pursuant to Defendants' Orders constitutes a regulatory taking of Plaintiff's property without just compensation.

165.   "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960).

166.   "Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978) (*citing United States* v. *Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958); *see United*

*States* v. *Caltex, Inc.*, 344 U.S. 149, 156 (1952)).

167.    A government regulation is appropriately set aside when such action results in a

decrease to the value of an individual's property and "has no foundation in reason and is a mere

arbitrary or irrational exercise of power having no substantial relation to the public health, the

public morals, the public safety or the public welfare in its proper sense." *See Nectow v.*

*Cambridge*, 277 U.S. 183, 187-88, 48 S. Ct. 447, 448, 72 L.Ed. 842, 844 (1928) (*quoting*

*Euclid* v. *Ambler Co.*, 272 U.S. 365, 395).

168.    As has been demonstrated throughout the instant Complaint, Defendants' own

data, collected as part of its contact tracing operations, has established that the restaurant

industry is not connected in any way to at least 90%[13] of COVID cases in Pennsylvania.

169.    Because at least 90% of the COVID cases in Pennsylvania resulted from exposure

not connected in any way to the restaurant industry, the closure of Plaintiff's restaurants has no

substantial relation to the public health, safety, or welfare.

170.    To that end, the Defendants' mandated closure represents a taking of Plaintiff's

property without just compensation for the same, in violation of the Takings Clause of the Fifth

Amendment.

171.    Defendants' Orders prohibit and restrict the use of Plaintiff's property and have

caused a significant diminution or loss in value of that property.

172.    Plaintiff was forced to close his business, then operate at only a 25% capacity,

then close his businesses during their busiest and most profitable times, and now close all indoor

operations.  He was therefore obligated to bear the cost of government action without just

---

[13] In many weekly reports, the percentage of responding individuals who tested positive and did not visit a restaurant was between 91% and 94%.

compensation.

173.    As a result, Defendants' Orders violate the Takings Clause of the Fifth Amendment.

<div align="center">

**REQUEST FOR RELIEF**

</div>

WHEREFORE, Plaintiff Robert A. McCafferty, doing business as North Country Brewing Company, respectfully requests that this Honorable Court enter judgment in his favor, against Defendants, and seeks relief as follows:

(1)    a Declaratory Judgment that issuance and enforcement of the Defendants' Orders is unconstitutional for the reasons stated herein;

(2)    a temporary restraining order to enjoin Defendants from enforcing the arbitrary restrictions contained in Defendants' Orders through January 4, 2021;

(3)    a permanent injunction to prohibit Defendants from enforcing Defendants' Orders through limitations on capacity or closures;

(4)    an award of damages for the violation of Plaintiff's constitutional rights and the taking Plaintiff's property without compensation;

(5)    an award of costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1983 and 1988; and,

(6)    such other relief as this Court deems appropriate.

<div style="margin-left: 50%;">

Respectfully submitted,
LUTZ PAWK & BLACK

*s/Rebecca L. Black*
Rebecca L. Black, Esquire
PA I.D. #309127

LUTZ PAWK & BLACK
The NexTier Center Building
101 East Diamond Street, Ste. 102
Butler, PA  16001
(724) 285-3400
RebeccaBlack@LutzandPawkLaw.com
Attorney for Plaintiff

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT A. MCCAFFERTY, | ) | CIVIL DIVISION |
| individually and doing business as | ) | |
| NORTH COUNTRY BREWING COMPANY, | ) | |
| | ) | NO.   2:20-cv-2008 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMAS W WOLF, in his official capacity as | ) | |
| Governor of the Commonwealth of Pennsylvania, | ) | |
| and RACHEL LEVINE, MD, in her official | ) | |
| capacity as Secretary of the Pennsylvania | ) | |
| Department of Health, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, **REBECCA L. BLACK, ESQUIRE,** hereby certify that a true and correct copy of the

foregoing Complaint in Civil Action, was filed electronically with the Clerk of Court, using the

CM/EMF system on December 24, 2020, and copies have been sent by Regular, First-Class Mail

to the following:

Governor Thomas W. Wolf
508 Main Capitol Building,
Harrisburg, Pennsylvania, 17120

Secretary Rachel Levine, M.D.
Pennsylvania Department of Health,
Health and Welfare Building, 8th
Floor West, 625 Forster Street,
Harrisburg, Pennsylvania, 17120

_s/Rebecca L. Black_
Rebecca L. Black, Esquire
PA ID 309127
LUTZ PAWK & BLACK
101 E. DIAMOND STREET, SUITE 102
BUTLER, PA  16001
(724) 285-3400